**SIGNED THIS: August 25, 2010**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RAY E. SNYDER and GLORIA E. SNYDER, | ) | No. 09-81178 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ILLINI BANK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 09-8070 |
| | ) | |
| MICHAEL D. CLARK, as Chapter 12 Trustee for Ray E. Snyder and Gloria E. Snyder and Tri Ag, Inc., | ) | |
| Defendants. | ) | |
| | ) | |
| TRI AG, INC., | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ILLINI BANK, | ) | |
| Counter-Defendant. | ) | |

**O P I N I O N**

This adversary proceeding requires the Court to determine whether the equitable doctrine of marshaling should be applied for the benefit of Tri Ag, Inc. (TRI AG), the holder of a junior lien against certain crop proceeds held by the Chapter 12 Trustee, Michael D. Clark (TRUSTEE). Illini Bank (ILLINI), as the assignee of the senior lienholder, wants the funds for itself and opposes marshaling. TRI AG and ILLINI have filed cross motions for summary judgment supported by a stipulation of undisputed material facts.

## SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2). The moving party must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). A factual issue is material only if resolving it might change the outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to find in favor of the non-moving party on the evidence presented. *Id.*

In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or choose from among different reasonable inferences that might be drawn from the evidence. *Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC,* 464 F.3d 659, 664 (7th Cir. 2006). The court must view the evidence in the light most favorable to the non-moving party. *Id.*

When parties file cross motions for summary judgment, each motion must be assessed independently; denial of one does not necessitate grant of the other. *Lexion Medical, LLC v. Northgate Technologies, Inc.,* 618 F.Supp.2d 896, 899 (N.D.Ill. 2009). The court

2

must consider the evidence through separate lenses, always allowing the non-moving party the benefit of all conflicts in the evidence and choices among reasonable inferences from that evidence. *Rhino Linings USA, Inc. v. Harriman,* 658 F.Supp.2d 892, 896 (S.D.Ind. 2009). If summary judgment is not granted, the court should nevertheless, to the extent practicable, determine what material facts are not genuinely at issue and issue an order to that effect, thus establishing those facts as the law of the case. Fed.R.Civ.P. 7056(d)(1).

**FACTUAL BACKGROUND**

The Debtors, Ray and Gloria Snyder (DEBTORS), filed their Chapter 12 Petition on April 15, 2009. One of the issues raised by the movants is whether the farm assets are owned jointly by the DEBTORS or solely by Ray Snyder. Schedule I filed by the DEBTORS designates Ray as "Self Employed Farmer" and Gloria as "Retired." The schedule lists Ray as the sole recipient of the farm income and Gloria as receiving a pension or other retirement income. However, Schedule A lists the real property including the farm ground as owned jointly and Schedule B lists all of the personal property farm assets as owned jointly, including "stored corn" subject to the liens of Ag-Land FS, Inc. (AG-LAND), TRI AG and ILLINI.

TRI AG'S debt is the oldest, dating back to 2002, evidenced by a promissory note dated August 5, 2002, in the amount of $129,544.22, signed by both DEBTORS, due and payable in full on February 5, 2003, with interest accruing at 7% per annum. The debt, obviously not paid when due, was initially unsecured. However, on February 10, 2006, Ray Snyder only, signed a security agreement granting TRI AG a security interest in all crops grown and/or stored on real estate located in Logan and Mason counties. To perfect

3

that security interest, a UCC financing statement naming Ray as the sole debtor was filed with the Secretary of State, but not until April 7, 2006. As of the petition date, TRI AG was owed $123,342.

In the gap period between the execution of TRI AG'S security agreement and the filing of the financing statement, AG-LAND jumped in. On February 27, 2006, AG-LAND filed a UCC Financing Statement with the Secretary of State naming both Ray and Gloria as debtors and describing the collateral, in material part, as all growing and harvested crops. Subsequently, three AG-LAND debt instruments were signed which TRI AG concedes relate back to the earlier filed financing statement. On January 8, 2008, Ray Snyder only, signed a Line of Credit Note and Security Agreement in the amount of $100,000 secured by a security interest in, among other things, all growing and harvested crops. On March 22, 2008, Ray and Gloria both signed a second Line of Credit Note and Security Agreement in the amount of $50,000, also secured by crops. On January 12, 2009, Ray and Gloria both signed a third Line of Credit Note and Security Agreement with AG-LAND in the amount of $100,000 secured by crops. As of the petition date, AG-LAND was owed a total of $130,897.05. TRI AG concedes that its security interest in crops and their proceeds is junior to that of AG-LAND.

In 2007, the DEBTORS borrowed money from ILLINI, both signing a note in the amount of $217,000 and a note in the amount of $469,000. Concurrent with the notes, the DEBTORS both signed an Agricultural Security Agreement granting ILLINI a security interest in crops, machinery and equipment, among other things. ILLINI perfected its lien by filing a UCC Financing Statement with the Secretary of State, naming only Gloria as the

4

Debtor, but immediately corrected by an amended financing statement naming both DEBTORS. As of the petition date, ILLINI was owed a total of $492,786.62 on the two notes referenced above.

The first court hearing in the case was held on May 12, 2009, on the DEBTOR'S motion to borrow and on a proposed stipulation and agreed order determining the treatment and payment terms of ILLINI'S claims, to which AG-LAND objected. Counsel for the DEBTORS, ILLINI, AG-LAND and TRI AG attended the hearing, at which TRI AG'S marshaling right was expressly raised and discussed among the Court and counsel. About one month later, on June 17, 2009, AG-LAND sold and assigned its secured claim to ILLINI. The bankruptcy rules authorize claims trading, a practice whereby a creditor sells its claim against a debtor to a third party. *See* F.R.B.P. 3001(e); *In re Kreisler,* 546 F.3d 863 (7th Cir. 2008). By purchasing AG-LAND'S position, ILLINI leapfrogged TRI AG from third to first priority on the crop lien, to the extent of AG-LAND'S claim amount. The claim acquisition also put ILLINI in first place as to the farm equipment since it acquired AG-LAND'S first priority equipment lien as well.

On December 18, 2009, the DEBTORS filed a report asserting that the stored corn that they owned as of the petition date sold for net proceeds of $39,084.40. The report asserts that the wheat crop harvested post-petition was sold for net proceeds of $16,262.48. The report references an anticipated crop insurance payment in an unknown amount. The report also itemizes crop insurance proceeds previously turned over to the TRUSTEE in the amount of $27,342. The parties later stipulated that the expected crop insurance proceeds were paid to the TRUSTEE in the amount of $17,832. So the total crop proceeds at issue is

$100,520.88. Since this amount is less than the petition date balance owed to AG-LAND, ILLINI stands in first priority position with respect to the full amount of the proceeds.

TRI AG does not have a security interest in machinery and equipment; its only lien is on the crop proceeds. In addition to the crop lien, ILLINI holds an equipment lien and several mortgages on real estate. Based upon an appraisal conducted post-petition by Nelson Aumann, the parties stipulated that the total value of the equipment liened to ILLINI is $326,830.88.

The DEBTORS filed their Chapter 12 Plan of Reorganization (Plan) on July 15, 2009. The Plan acknowledges the sale of AG-LAND'S position to ILLINI and proposes to pay ILLINI all of the 2008 crop proceeds with any deficiency (for reasons unexplained) to be paid in full in 2010 from the 2009 crop proceeds, with TRI AG treated as entirely unsecured.

## ANALYSIS

**A. General marshaling principles.**

The equitable doctrine of marshaling rests upon the principle that a creditor having two funds to satisfy his debt should not be permitted to arbitrarily prejudice a junior creditor who may resort to only one of the funds. *Meyer v. U.S.,* 375 U.S. 233, 236, 84 S.Ct. 318 (1963). The junior creditor's secured interest may be protected by forcing the senior creditor to first exhaust the fund not available to the junior creditor, i.e., to marshal the order of liquidation in the way most favorable to the junior creditor.

The doctrine, founded in equity, is designed to promote fair dealing. *Id.* at 237.

Marshaling should not be applied when the result would be inequitable to the senior creditor. *In re Bank of Oakley,* 131 Cal.App. 203, 210, 21 P.2d 164 (Cal.App. 1 Dist. 1933). Inequity might be in the form of mere delay or inconvenience to the senior creditor. *Toledo Blank, Inc. v. Pioneer Steel Serv. Co.,* 98 Ohio App.3d 109, 114, 648 N.E.2d 1 (Ohio App. 6 Dist. 1994). The remedy has been denied where the fund or property available to the senior creditor is of uncertain value. *Id.* Most certainly, the prejudice to be avoided is rendering an oversecured senior creditor undersecured because of an ill-advised marshaling order. *See Sowell v. Federal Reserve Bank of Dallas, Tex.,* 268 U.S. 449, 457, 45 S.Ct. 528 (1925). The party seeking to invoke marshaling bears the burden to show that the senior lienholder will not be prejudiced or suffer a hardship if marshaling is ordered. *Herzog v. NBD Bank of Highland Park,* 203 B.R. 80, 83 (N.D.Ill. 1996). As courts of equity, bankruptcy courts have the power to apply the principles and rules of equity jurisprudence. *Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238 (1939).

**B. TRI AG'S failure to obtain Gloria's signature.**

ILLINI'S first argument is that marshaling is not available because TRI AG failed to have Gloria Snyder sign its security agreement and financing statement. Therefore, argues ILLINI, there is no "common debtor" as required by Illinois law as a precondition to marshaling. While it may have some surface appeal, the argument loses its luster upon closer evaluation and the Court rejects it for the following reasons.

The common debtor principle is designed to protect innocent third parties, such as a debtor's partners, shareholders, guarantors and sureties, from undue dissipation of their

7

assets. *See, e.g., Herzog v. NBD Bank of Highland Park,* 203 B.R. at 83. It is considered inequitable if the benefit of marshaling for a junior secured creditor comes at the expense of a third party.

As pointed out by TRI AG, Ray and Gloria are each indebted on the notes of ILLINI and AG-LAND, and on two of the three notes of TRI AG, and so are debtors common to both TRI AG and ILLINI. Moreover, Gloria's failure to grant a security interest in her ownership interest in the crops does not preclude marshaling in the context of this bankruptcy case. As a joint debtor in a Chapter 12 case, all of Gloria's assets are property of the estate subject to administration under a plan, once confirmed. The DEBTORS' Plan, of which Gloria is a proponent, proposes to use all of the farm assets – real estate, machinery and equipment, crops and proceeds – to fund and generate revenues to make the required payments. The Plan does not assert that Gloria owns any farm related assets that are not fully encumbered. So a marshaling order awarding the crop proceeds to TRI AG instead of ILLINI, will have no effect on Gloria's property interests or on her ability to confirm and consummate a plan. Under these circumstances, even assuming, arguendo, that Gloria is not technically a common debtor, that discrepancy should not operate as a *per se* bar to marshaling. Equitable remedies are to be applied flexibly, not rigidly, in light of the context and particular circumstances in play. *Lewsader v. Wal-Mart Stores, Inc.,* 296 Ill.App.3d 169, 182, 694 N.E.2d 191, 199 (Ill.App. 4 Dist. 1998). In addition, Ray is indisputably a common debtor, so there is no bar to marshaling to protect the security interest that he conveyed.

**C. Does Gloria own the crops?**

Next, it is necessary to address the extent of TRI AG'S interest in and the issue of Gloria's ownership of the crop proceeds. If Gloria had signed the security agreement and financing statement with TRI AG, it wouldn't be an issue. But if Gloria owns the crop proceeds, in whole or in part, then her failure to sign calls into question the extent of TRI AG'S lien. Generally, where collateral is jointly owned, the grant of a lien by one owner extends only to that owner's partial interest. *Motz v. Central Nat. Bank,* 119 Ill.App.3d 601, 607-08, 456 N.E.2d 958 (Ill.App. 1 Dist 1983).

Under section 9-203 of the Uniform Commercial Code, the general rule is that a security interest is enforceable against a debtor only if the debtor has authenticated a security agreement. 810 ILCS 5/9-203(b)(3)(A). Authenticate means "to sign." 810 ILCS 5/9-102(a)(7)(A). One possibly applicable exception to section 9-203's general rule allows a nonsignatory to become bound by another person's security agreement if, by operation of applicable non-Article 9 law or by contract, the security agreement becomes effective to create a security interest in the non-signer's property. 810 ILCS 5/9-203(d)(1). For that exception to apply here, Gloria would have had to agree by contract to be bound by the TRI AG security agreement, or alternatively, she could be bound by Ray's authentication of the security agreement via application of one or more principles of agency law. *See Matter of Slagle,* 78 B.R. 570 (Bankr.D.Neb. 1987); *Matter of Schulz,* 63 B.R. 168 (Bankr.D.Neb. 1986). No evidence has been presented that could support either basis for the exception.

On the factual issue of Gloria's ownership of the crop proceeds, the starting point is to recognize that in Illinois married people may own property separately even when

acquired during the marriage. The Illinois Supreme Court has made it clear that the statutory concept of marital property, 750 ILCS 5/503, is defined only for the purposes of division on dissolution of marriage or legal separation and has no application during the marriage. *Kujawinski v. Kujawinski,* 71 Ill.2d 563, 572, 376 N.E.2d 1382 (1978) (section 503(b) does not prevent married persons from owning property separately during the marriage and disposing of it in any fashion that the property-owning spouse may choose).[1] Neither is there any indication in Illinois statutory or common law, that marriage gives rise to a presumption of joint or co-ownership of personal property acquired during the marriage.[2]

Real estate is different. Where expressly provided in the deed, title to real property may be held in joint tenancy, or by a married couple as tenants by the entireties, otherwise as tenants in common. 765 ILCS 1005/1. When a husband and wife hold joint title to real estate, a strong presumption arises that each spouse has an undivided one-half interest, irrespective of the contributions made by each to the acquisition of the property. *Capogreco v. Capogreco,* 61 Ill.App.3d 512, 515, 378 N.E.2d 279 (Ill.App. 5 Dist. 1978). Absent a contrary agreement, co-owners of real estate are presumed to have an equal interest in the rents or profits derived from the real estate and must account to each other for the income. *Wolkau v. Wolkau,* 299 Ill. 176, 183, 132 N.E. 507 (1921).

Presumptions aside, however, the question of ownership of assets between spouses boils down to a question of intent. Intent as to ownership is provable directly and

---

[1] To the extent that *In re Okon,* 310 B.R. 603 (Bankr.N.D.Ill. 2004), suggests that spouses automatically acquire an ownership interest in each other's property acquired during the marriage by operation of section 503, this Court disagrees. ILLINI'S contention that Illinois law recognizes a general presumption that all property acquired by either spouse during the marriage is presumed to be jointly owned is incorrect.

[2] Clarity requires that it be noted that, absent a contrary writing, co-ownership of untitled tangible personal property may only be held by tenancy in common. The Illinois Legislature long ago abolished, generally, the use of joint tenancy with right of survivorship for personal property. 765 ILCS 1005/2.

10

circumstantially. *See In re Lampe*, 331 F.3d 750 (10th Cir. 2003) (court relied on testimony of joint ownership, that wife worked on the farm, that she deposited her off-farm income into joint account out of which farm equipment was purchased, and that she signed the notes and security agreements to obtain operating loans). On Schedule B, the DEBTORS declare that a number of items of personal property are owned individually by Ray (H) or Gloria (W). Most of the items, however, and all of the farm assets, are listed as jointly owned, including the stored corn. This representation is consistent with the assertion of joint ownership of real estate made on Schedule A. Since grain grows on land, the presumption of equal ownership of jointly titled real estate applies to the grain grown on that real estate. Gloria also signed some of the various notes for the farm loans. This direct and circumstantial evidence supports the conclusion that Gloria owns half of the crop proceeds.

TRI AG relies upon certain circumstantial evidence of a contrary intent, the admissibility of which ILLINI disputes. The receipts for corn issued by certain grain elevators are issued in Ray's name only as are two crop insurance checks issued by State Farm. There are certainly alternative explanations for why the name of only one joint owner of grain might appear on an elevator ticket or an insurance check. Even assuming those documents are properly admissible, they are not enough to create a genuine issue of fact in light of the strong presumption of joint ownership created by the real estate titles and the DEBTORS' declaration of joint ownership in their schedules. Based on the record before the Court, the Court finds that Gloria has a one-half ownership interest in the crop proceeds at issue. Because she failed to sign TRI AG'S security agreement, TRI AG

acquired and holds a lien on only one-half of the proceeds. Contrary to ILLINI'S argument, however, marshaling does not fail *ipso facto*. Rather, TRI AG'S lien is limited to one-half of the crop proceeds at issue, but marshaling may be applied to protect that half interest.

### D. Should marshaling be evaluated vis-a-vis AG-LAND or ILLINI?

If AG-LAND had not sold its claim to ILLINI, AG-LAND, holding a first priority lien on the crop proceeds and on machinery and equipment, would have been substantially oversecured. Under that circumstance, TRI AG would have had a marshaling right vis-a-vis AG-LAND. The sale of AG-LAND'S claim to ILLINI jeopardizes that right unless ILLINI purchased the claim subject to TRI AG'S marshaling interest. Another way to phrase the issue is to ask whether TRI AG'S marshaling right should be evaluated based upon the petition-date circumstances when AG-LAND owned the claim or after the postpetition acquisition by ILLINI. Because AG-LAND was substantially oversecured while ILLINI may not be, the marshaling analysis is potentially altered in a material way by the claim trade. Of course TRI AG contends that the analysis should be applied to the pre-trade facts while ILLINI argues for a post-trade application.

As a general rule, the purchaser of a claim against a debtor in bankruptcy steps into the shoes of the claim seller, enjoying the same benefits, but suffering the same limitations of the claim, as a successor in interest to the seller's position. *In re Applegate Property, Ltd.*, 133 B.R. 827, 833 (Bankr.W.D.Tex. 1991). An assignee of a claim may not receive more than the assignor would have been entitled to without the assignment since an assignment operates to transfer no greater right or interest than was possessed by the assignor. *In re Defense Services, Inc.,* 104 B.R. 481, 484-85 (Bankr.S.D.Fla. 1989). Likewise, under Illinois

law, the assignee of a contract stands in the shoes of the assignor and takes the assignor's interest subject to all legal and equitable defenses existing at the time of assignment. *Stavros v. Karkomi*, 39 Ill.App.3d 113, 123, 349 N.E.2d 599 (Ill.App. 1 Dist. 1976). An assignment of a promissory note does not deprive the obligor of any defenses he may have had against the original note-holder. *See JPMorgan Chase Bank, N.A. v. PT Indah Kiat Pulp & Paper Corp.*, 2009 WL 3367388, n.4 (N.D.Ill. 2009). A creditor's post-bankruptcy transfer of a claim subject to equitable subordination does not free the claim from the burden of subordination in the hands of the transferee. *In re Enron Corp.*, 333 B.R. 205, 223-24 (Bankr.S.D.N.Y. 2005).

The unusual twist here is that the claim assignment is being offered by ILLINI as the basis for denying an equitable right that a third party, TRI AG, held against the assignor, AG-LAND. As far as the Court can tell, whether a claim assignment may operate to shed an equitable right of marshaling held by a third party has never been decided in a reported judicial opinion.[3] The Bankruptcy Code provides no answer or guidance; there is neither a statutory right nor prohibition to the result sought by ILLINI. In the absence of a federal rule of decision, state law and general equity jurisprudence should be consulted.

Although there is some dispute whether an assignee for value takes a claim free from the equities of third persons against the assignor, of which the assignee had no notice, there is no dispute that the assignee takes the claim subject to the equities of third persons against the assigned right where he has knowledge of such equities. *Fiberchem, Inc. v.*

---

[3] This Court has previously recognized, *in dictum,* the inequity of a second priority lienholder's loss of a marshaling right potentially caused by a subordination agreement between the first priority and third priority lienors. *In re Batterton,* 2001 WL 34076431 (Bankr.C.D.Ill. 2001).

*General Plastics Corp.,* 495 F.2d 737, 738-39 (9th Cir. 1974). *Accord, QuikPac, Inc. v. Reynolds-Freeborn Co.,* 2005 WL 1939996 (S.D.Ind. 2005) (Tinder, J.). In this Court's view, this rule of decision is applicable in the context of a claim trade in bankruptcy. If ILLINI purchased AG-LAND'S claim with knowledge of TRI AG'S interest, then ILLINI will be deemed to have acquired the claim subject to TRI AG'S marshaling rights.

TRI AG contends that ILLINI purchased the claim from AG-LAND with full knowledge of TRI AG'S marshaling rights. Although ILLINI has not stipulated to that fact, it is indisputably true as a matter of record in light of the frank discussion of TRI AG'S marshaling rights that occurred in open court on May 12, 2009, more than one month before ILLINI purchased the claim. Applying the rule of decision to this factual finding leads to the conclusion that ILLINI acquired the claim subject to TRI AG'S marshaling rights. The claim trade will not be permitted to eliminate or impair TRI AG'S right to compel a marshaling of assets to protect its junior lien in the crop proceeds, to the same extent as if AG-LAND still owned the claim. The record supports the conclusion that AG-LAND was sufficiently oversecured to permit marshaling to be ordered.

For these reasons, the Court determines that TRI AG is entitled to summary judgment as to half the proceeds in question. ILLINI is entitled to summary judgment as to the other half.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###